ROBERT A. PENROD, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2484-84—2486-84.     Filed May 27, 1987.

*John Tyler, Lawrence E. Newlin*, and *Eric S. Chofnas*, for
the petitioners.
*Rodney J. Bartlett* and *Brett J. Miller*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined deficien-
cies in the petitioners' Federal income taxes as follows:

| Petitioner | Year | Deficiency |
|---|---|---|
| Robert A. Penrod | 1973 | $7,669.92 |
| | 1974 | 11,133.58 |
| | 1975 | 482,808.43 |
| | 1976 | 149,896.00 |
| | 1977 | 13,174.00 |
| Ronald L. Peeples | 1975 | 63,904.30 |
| and Carol A. Peeples | 1976 | 42,892.02 |
| | 1977 | 4.00 |
| Charles E. Penrod | 1975 | 208,949.79 |
| and Mary E. Penrod | 1976 | 99,417.33 |
| | 1977 | 1,639.37 |

[1]Cases of the following petitioners have been consolidated herewith: Ronald L. Peeples and
Carol A. Peeples, docket No. 2485-84; and Charles E. Penrod and Mary E. Penrod, docket No.
2486-84.

The issues for our decision are: (1) Whether the exchange of stock of corporations owned by the petitioners for stock of McDonald's Corp. (McDonald's) qualifies as a tax-deferred reorganization under section 368, I.R.C. 1954;[2] and (2) whether the petitioners are entitled to the distributive shares of partnership losses claimed by them for 1976 and 1977.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

At the time the petitions in this case were filed, petitioner Robert A. Penrod resided in Atlanta, Georgia; petitioners Ronald L. Peeples and Carol A. Peeples, then husband and wife, resided in Birmingham, Alabama; and petitioners Charles E. Penrod and Mary E. Penrod, husband and wife, resided in Smyrna, Georgia. All of the petitioners filed Federal income tax returns for the years in issue with the Internal Revenue Service Center in Chamblee, Georgia, except that petitioners Ronald and Carol Peeples filed their Federal income tax return for 1976, and petitioners Charles and Mary Penrod filed their Federal income tax return for 1977, with the Internal Revenue Service Center in Ogden, Utah.

Prior to May 15, 1975, petitioners Robert A. Penrod (Bob), Charles E. Penrod (Chuck), and Ronald L. Peeples (Ron), together with Jack Penrod (Jack),[3] owned stock in a number of corporations which operated McDonald's fast-food restaurants in South Florida. Jack Penrod and petitioners Bob and Chuck Penrod are brothers. Petitioner Ron Peeples was the brother-in-law of the Penrods during the years in issue. Jack, Bob, and Chuck Penrod and Ron Peeples will sometimes be referred to collectively as the Penrods.

Jack first became involved with McDonald's in 1961, when he began working as a "grill man" in a McDonald's restaurant in Tallahassee, Florida. Within 3 weeks, he was promoted to manager of such restaurant. Jack subsequently

---

[2] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

[3] Jack Penrod is not a party to this proceeding.

became the manager of another McDonald's restaurant in Ft. Lauderdale, Florida. When the owner of the Ft. Lauderdale franchise passed away, Jack and a partner acquired such franchise from the owner's estate. After that time, Jack enjoyed considerable success, and he began to acquire additional McDonald's franchises. After Jack opened five McDonald's restaurants, he formed Penrod Management, Inc. (Penrod Management), to provide management and support services to such restaurants.

Bob began working as a maintenance man in the Penrod restaurants in 1966. Bob eventually became vice president of Penrod Management, in charge of the overall operations of the restaurants owned by the Penrods. Chuck began with Penrod Management in 1972. He ultimately rose to supervise four McDonald's restaurants. Ron started with Penrod Management in 1973 as a maintenance man and worked his way through the ranks to become a supervisor of four restaurants.

By May 1975, the Penrods had acquired franchises for 16 McDonald's restaurants in South Florida. In all cases but one, a separate corporation was formed to hold each franchise and to operate each restaurant. In one case, a single corporation owned and operated two McDonald's restaurants. On May 15, 1975, the Penrods had interests in such corporations as follows:

| Corporation | Jack Penrod | Bob Penrod (acquisition date) | Chuck Penrod (acquisition date) | Ron Peeples (acquisition date) |
|---|---|---|---|---|
| Dania Foods, Inc. | 900 shares | 100 shares (01/01/75) | 0 | 0 |
| Davie Foods, Inc. | 600 shares | 200 shares (01/01/75) | 200 shares (01/01/75) | 0 |
| Inverrary Foods, Inc. | 800 shares | 200 shares (01/01/75) | 200 shares (01/01/75) | 0 |
| 441 Hollywood Foods, Inc. | 600 shares | 200 shares (01/01/75) | 200 shares (01/01/75) | 0 |
| Davie I-95 Foods, Inc. | 600 shares | 200 shares (01/01/75) | 200 shares (01/01/75) | 0 |
| Hallandale Foods Inc. | 600 shares | 200 shares (01/01/75) | 200 shares (01/01/75) | 0 |
| Cutler Ridge Foods Inc. | 600 shares | 200 shares (01/01/75) | 0 | 200 shares (01/01/75) |
| Margate Foods Inc. | 889 shares | 111 shares [1] | 0 | 0 |
| Sunrise Foods Inc. | 100 shares | 0 | 0 | 0 |
| Coral Ridge Foods Inc. | 800 shares | 100 shares (01/01/75) | 100 shares (01/01/75) | 0 |
| Ft. Lauderdale Foods, Inc. | 600 shares | 100 shares [1] | 0 | 0 |

| Corporation | Jack Penrod | Bob Penrod (acquisition date) | Chuck Penrod (acquisition date) | Ron Peeples (acquisition date) |
|---|---|---|---|---|
| No. 1167 Foods, Inc. | 41 shares | 17 shares [1] | 0 | 10 shares [1] |
| Homestead Foods, Inc. | 48 shares | 16 shares [1] | 0 | 16 shares [1] |
| Dade Foods, Inc. | 408 shares | [unknown] [1] | 136 shares [1] | 136 shares [1] |
| P.M.C., Inc. | 56 shares | 12 shares [1] | 12 shares [1] | 0 |

[1]Sometime prior to May 15, 1974.

In addition to his interest in such corporations, Jack owned all the outstanding stock of Penrod Management. All of the corporations in which the Penrods owned an interest (the Penrod corporations) filed valid elections under section 1362 to be treated as small business corporations for Federal income tax purposes, except for P.M.C., Inc.; No. 1167 Foods, Inc.; Homestead Foods, Inc.; Dade Foods, Inc.; and Penrod Management.

By 1975, the Penrods had built an unusually successful and efficient organization. On February 20, 1975, Jack was visiting McDonald's corporate headquarters near Chicago, Illinois, when McDonald's president, Fred Turner, told Jack that he wished to acquire the restaurants owned by the Penrods. In subsequent discussions, McDonald's management indicated that the company wanted to use the pooling of interest method of accounting for the acquisition on its financial statements. Accounting rules then in effect prevented McDonald's from using the pooling of interest method if McDonald's purchased the Penrod corporations for cash. For such reason, McDonald's management contemplated the acquisition would be achieved through an exchange of the stock owned by the Penrods for McDonald's common stock. At no time did Jack request cash for the Penrod stock; at all times, he agreed to the acquisition in exchange for McDonald's stock.

In March 1975, Jack met with McDonald's controller, Gerald Newman, and agreed upon the approximate value of the Penrod restaurants and the method to be used in computing the number of McDonald's shares to be issued in

the exchange. The remaining terms of the acquisition were negotiated by the Penrods' attorney, J. Bradbury Reed.

When Bob, Chuck, and Ron were informed of the pending merger, they became concerned that their relationship with McDonald's would be adversely affected. They wished to insure that the existing employees of the Penrod corporations would be retained by McDonald's after the acquisition. In addition, Bob, Chuck, and Ron sought assurances that they themselves would continue to be employed by McDonald's and that they would be given the chance to acquire their own McDonald's franchises at the earliest opportunity. Aside from these concerns, Bob, Chuck, and Ron were not involved in the negotiations with the McDonald's organization. Jack acted as the group's leader in such negotiations.

The final agreement and plan of reorganization (the agreement) called for McDonald's to issue its unregistered common stock in exchange for the stock in the Penrod corporations. Since SEC rules required that stock such as that received by the Penrods be registered before it could be sold in the first 2 years, Mr. Reed insisted on provisions in the agreement giving the Penrods incidental and demand registration rights with respect to their stock. The incidental rights were set forth in section 6.4 of the agreement, which required McDonald's to give written notice to the Penrods of any proposed registration of stock and to include any of the Penrod stock in such registration if requested to do so. The demand registration rights were contained in section 6.5 of the agreement, which provided that a majority of the Penrod stockholders could inquire whether McDonald's proposed a registration of stock and, if McDonald's did not, could demand that McDonald's register their stock. The demand registration rights could first be exercised in mid-August 1975 and expired on May 15, 1976. The expenses of a registration were generally to be paid by McDonald's. It was Mr. Reed's practice to negotiate for such registration rights on behalf of his clients each time he represented shareholders in a corporate acquisition. The Penrods made no express request that he negotiate for registration rights.

The agreement also contained a covenant not to compete which prohibited any of the Penrods from serving within 18 months after May 15, 1975, as "owner, partner, shareholder[,] * * * employee, consultant or otherwise" with respect to a drive-in carry-out restaurant operated within a 10-mile radius of any of the Penrod restaurants acquired by McDonald's. In addition, the agreement contained a provision under which each of the Penrods agreed that, for 2 years after the closing date:

he will not hire or attempt to hire for employment, in any business venture, any person who was an employee of * * * [an acquired Penrod corporation on May 15, 1975] without the written consent of McDonald's; provided, however, that the provisions of this sentence shall not prevent the hiring by any Stockholder without such consent of * * * [certain named key employees of the Penrod organization] or any other employee whose employment is terminated by McDonald's or one of its subsidiaries. Stockholders agree that in no event shall they attempt to induce any employee (other than those specifically named above) to cause the termination of his employment.

In addition to the provisions contained in the agreement, McDonald's promised that Bob, Chuck, and Ron would continue to be employed in some capacity by McDonald's after the acquisition and that they would be given the opportunity to acquire their own McDonald's franchises outside South Florida at the earliest opportunity. Such promises were conveyed in a separate letter to Jack and were not incorporated into the agreement.

After Jack and McDonald's agreed on the basis for the acquisition, the Penrods' attorneys drafted a proposed ruling request to be submitted to the IRS, in which the Penrods requested a determination that the acquisition would be treated as a reorganization under section 368. Representatives of McDonald's informed the Penrods' attorneys that McDonald's was anxious to close the acquisition quickly and that there was not sufficient time to wait for a ruling from the IRS; therefore, no ruling request was ever submitted to the IRS. Instead, the Penrods obtained an opinion from their attorneys that the merger qualified as a reorganization under section 368. The opinion included the statement that:

Our understanding of the circumstances under which the reorganizations will be accomplished is as follows:

                *    *    *    *    *    *    *

12. * * * McDonald's has no claims or agreements to reacquire any of the McDonald's shares issued to the shareholders of the Companies, and the shareholders have no present intention to sell or otherwise dispose of the McDonald's stock to be received in the reorganizations.

Mr. Newman, McDonald's controller, indicated that McDonald's would try to structure the merger as a tax-deferred reorganization. However, McDonald's provided no guarantee to the Penrods as to the tax consequences of the transaction.

On May 15, 1975, McDonald's and the Penrods executed the agreement, which transferred ownership and management of the Penrod corporations to McDonald's. In exchange for the stock of such corporations, the Penrods received 106,464 shares of McDonald's unregistered common stock. Of such amount, Jack received 79,266 shares, Bob received 15,833 shares, Chuck received 7,648 shares, and Ron received 3,717 shares. As required by the agreement, 10 percent of the shares received by the Penrods, or 10,646 shares, were held in escrow to cover any claims or liabilities of the acquired corporations which arose after the closing.

After May 15, 1975, Bob, Chuck, and Ron continued to work in the restaurants. However, it became apparent that McDonald's intended to change the management of such restaurants. McDonald's brought in new supervisors and managers, transferred managers who had worked for the Penrods to other restaurants, and remodeled and installed new equipment in several restaurants. Employees who had worked for Bob before the merger complained to him about such changes and expected him to represent their interests with the new management. After Bob voiced the concerns of such employees to McDonald's management, he was told to simply stay home and collect his McDonald's paycheck, and to stay away from the restaurants. Despite these warnings, Bob continued to visit the restaurants.

Between May 19, 1975, and November 12, 1975, Bob borrowed a total of $49,000 from the Dania Bank of Dania, Florida. He pledged the McDonald's stock received by him

in the acquisition as collateral for such loans. In addition, both Chuck and Ron borrowed funds from the Dania Bank to purchase airplanes. They also pledged their McDonald's stock as collateral for such loans.

Sometime in 1974, Jack began to plan the development of a chain of restaurants to be known as "Wuv's." Jack intended Wuv's to compete in the fast-food market and expected his competition to be other fast-food restaurants such as McDonald's, Burger King, and Wendy's. In August 1974, Jack engaged a Washington, D.C., attorney to conduct a trademark search to determine whether the name "Wuv's" was available for use as a fast-food service mark.

On May 16, 1975, Jack and Bob, as officers, directors, and incorporators, executed a certificate of incorporation for Wuv's, Inc. (Wuv's). Such certificate showed Wuv's corporate purpose to be to "engage in the business of selling food and beverages at retail, [and the] operation of a restaurant." Jack served as the president of Wuv's. Although Bob was listed as the vice president of Wuv's on its certificate of incorporation, he was not listed as an officer of Wuv's in a memorandum sent to prospective Wuv's investors and franchisees. Bob did not have the authority to sign checks for Wuv's.

In connection with his plans for Wuv's, Jack made some calculations in his "daytimer" as to the amounts of funds that would have to be secured to start up Wuv's. He estimated that he would acquire 5 "build to suit" restaurants for $50,000 each, and 25 other restaurants at a cost of $210,000 each. For those other restaurants, he expected to put up $50,000 each, and to finance the balance. Thus, he concluded that he could have in operation 30 restaurants by the end of 1976 requiring not more than $1,500,000 of funds supplied by him.

On October 7, 1975, the Dania Bank sent Jack a commitment letter which stated the terms of a negotiated loan agreement between Jack, Wuv's, and the bank. The bank agreed to offer a credit line not to exceed $2 million, with $1,500,000 extended to Jack personally and $500,000 to Wuv's. On October 8, 1975, the controller of Penrod Management, Peter N. Bonitatibus, sent a letter to the Dania Bank accepting the loan commitment. In such letter,

Mr. Bonitatibus indicated that Jack planned to sell enough McDonald's stock to pay existing debts of $1 million and to satisfy an estimated Federal income tax liability of 25 percent on such sale. In addition, he indicated that Jack agreed to retain approximately $2 million worth of McDonald's stock to serve as collateral for the loan.

In mid-August 1975, McDonald's common stock closed at approximately $44 per share on the New York Stock Exchange; by November 11, 1975, the price had risen to $58 per share. On that day, Mr. Reed sent a letter to McDonald's management, pursuant to section 6.5 of the agreement, inquiring as to whether McDonald's intended within 60 days to file a registration statement with the SEC which would allow the Penrods to register their McDonald's stock for sale. Such letter further stated that, if McDonald's did not intend to file such registration statement, the Penrods as a group desired to sell approximately 60,000 shares received from McDonald's pursuant to the acquisition. By reply letter dated December 3, 1975, McDonald's informed the Penrods that it did not plan to file a regular registration statement and that it was preparing to file a registration statement on the Penrods' behalf to be effective after January 1, 1976. Such letter further reflected McDonald's understanding that the Penrods had decided, subsequent to Mr. Reed's November 11 letter, to sell all of the shares received by them in the acquisition, except for those held in escrow. On December 3, 1975, McDonald's common stock closed at approximately $54 per share on the New York Stock Exchange. When the registration statement for the Penrods was filed with the SEC, the number of shares to be sold by them had increased to 96,554.

McDonald's stock covered by the registration statement for the Penrods was sold on January 12, 1976, for approximately $60 per share. Bob, Chuck, and Ron appointed Jack as their agent in negotiating for such sale. As of January 14, 1976, the Penrods owned 10,646 shares of McDonald's stock, all of which was held in escrow by McDonald's pursuant to the agreement. Jack owned 7,927 of such shares, Bob owned 1,583 shares, Chuck owned 765 shares, and Ron owned 371 shares.

On October 6, 1975, Bob received a letter from Burton D. Cohen, the assistant counsel for McDonald's, which terminated Bob's employment with McDonald's. The letter also demanded that Bob return the salary previously paid to him by McDonald's and revoked McDonald's promise to offer Bob a franchise. McDonald's indicated that it took such action because it believed that Bob was "deeply involved in the organization of a competing restaurant chain."

Wuv's had its principal office in South Florida. By December 31, 1975, Jack had opened three Wuv's restaurants. One such restaurant was in Boca Raton, Florida, and another was in Deland, Florida. By December 31, 1976, approximately 20 Wuv's restaurants were opened. Ordinarily, it takes a minimum of 12 months to plan, obtain zoning variances and building permits, and actually construct a fast-food restaurant such as Wuv's. In assembling his management team at Wuv's, Jack hired three important regional employees of McDonald's. All of those individuals were hired to work in the same or similar capacity as that in which they worked for McDonald's.

National Investment Development Fund II (NIDF II) was a limited partnership organized prior to June 30, 1976, by Stephen Moses. NIDF II engaged in no business when formed. It was organized as a "shelf partnership" so as to be available to take advantage of future investment opportunities. It was also formed to avoid what Mr. Moses perceived to be tax restrictions on partnerships imposed by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520.

In 1976, Jack received a partnership offering memorandum from NIDF II. After deciding to invest in NIDF II, he drew a series of checks from the "Jack Penrod Real Estate Account" to such partnership. The amounts and dates of such checks were as follows:

| Amount | Date written |
| --- | --- |
| $100,000 | 8/03/76 |
| 87,500 | 9/30/76 |
| 125,000 | 9/30/76 |

On October 6, 1976, an amended limited partnership agreement for NIDF II was recorded with the Los Angeles County Recorder. Such document indicated that Jack, Bob, Chuck, and Ron had been admitted as limited partners of

NIDF II as of June 25, 1976. On December 17, 1976, NIDF II transferred $100,000 to Jack.

On August 10, 1976, and on October 7, 1976, Bob wrote checks of $50,000 each to Jack. Both of such checks were deposited to the Jack Penrod Real Estate account

On October 1, 1976, NIDF II transferred $150,000 to a Texas partnership, Duo Investment Fund 1976-B, Ltd. (Duo). On December 30, 1976, Jack also invested $110,000 directly in Duo. On December 31, 1976, an amended limited partnership agreement for Duo was recorded in the office of the Secretary of State of Texas. Such document indicated that the general partners of Duo were Harry D. Hawn, William R. Wortley, and Stephen Moses, and that NIDF II was the sole limited partner. Such document stated that Duo's purpose was to invest as a partner in other partnerships.

On December 30, 1976, an amended limited partnership agreement for Environmental Investors III (Environmental) was filed with the office of the Secretary of State of Texas. Such agreement, which was dated December 29, 1976, indicated that the general partners of Environmental were Mr. Hawn and Mr. Wortley and that Mr. Hawn, Mr. Wortley, and Duo were class A limited partners of Environmental. The agreement also recited that Duo made capital contributions of $150,000 to Environmental. Environmental was formed to acquire and develop rental real estate.

On June 30, 1976, the partners of Arlington Apartment Associates (Arlington Associates) executed an amended partnership agreement, which admitted Duo as a class B limited partner. Under such agreement, Duo promised to contribute $110,000 to Arlington Associates on or before December 29, 1976. The agreement indicated that Mr. Wortley was a general partner of Arlington Associates. Arlington Associates was formed to acquire and develop real estate. As of June 30, 1985, the $110,000 payment promised by Duo had not been made.

On his Federal income tax return for 1976, Robert Penrod reported the gain on the sale of his McDonald's stock as long-term capital gain. In like manner, Charles and Mary Penrod and Ronald and Carol Peeples reported such gain as long-term capital gain on their Federal income tax returns

for 1976. McDonald's treated its acquisition of the Penrod corporations as a taxable purchase on its Federal income tax returns.

On his Federal income tax returns, Robert Penrod claimed partnership losses from NIDF II of $342,237 in 1976 and $27,601 in 1977.[4] On their Federal income tax returns, Charles and Mary Penrod claimed partnership losses from NIDF II of $178,558 in 1976 and $14,406 in 1977. On their Federal income tax returns, Ronald and Carol Peeples claimed partnership losses of $104,160 in 1976 and $8,000 in 1977.

In the notices of deficiency sent to the petitioners, the Commissioner determined that the exchange of stock of the Penrod corporations for McDonald's stock did not qualify as a reorganization under section 368, due to the absence of a continuity of interest on the part of the Penrods. Accordingly, the Commissioner determined that the petitioners should have recognized an immediate gain from the exchange of their shares on May 15, 1975.

In addition, the notices of deficiency disallowed the losses claimed by the petitioners in 1976 and 1977 with respect to their interests in NIDF II. Such losses were disallowed because the Commissioner determined that the petitioners failed to establish: (1) That they were in fact partners in NIDF II; (2) that NIDF II was a partner in Duo and that NIDF II was entitled to deduct its distributive share of the ordinary losses of Duo; (3) that Duo was a partner in Environmental, Arlington Associates, and WRW LTD.,[5] and that Duo was entitled to deduct its distributive share of the ordinary losses of such partnerships; and (4) that the allocations of ordinary losses by Environmental, Arlington Associates, and WRW LTD., had substantial economic effect and reflected the varying interests of their partners under sections 704(b)(2) and 706(c)(2).

---

[4] On their Federal income tax returns, the petitioners reported such losses were incurred from their investment in National Investment Development Corp. The discrepancy arose because Mr. Bonitatibus, who was responsible for accumulating the petitioners' tax information, did not receive NIDF II's Form 1065, Schedule K-1, by the due date of the petitioners' tax returns. Thus, he had to get the information relating to NIDF II over the telephone, and in doing so, attributed such information to the wrong entity. We find that the losses claimed by the petitioners were incurred by NIDF II.

[5] In the notices of deficiency, the Commissioner made references to a limited partnership known as WRW, Ltd. However, none of the parties introduced evidence relating to such partnership, and we have made no findings of fact with respect to it.

OPINION

The first issue for decision in this case is whether the exchange of stock owned by the petitioners for stock in McDonald's qualifies as a reorganization under section 368. The parties agree that the transaction constituted a statutory merger that was in form eligible for reorganization treatment under section 368(a)(1)(A). However, the Commissioner determined that such exchange of stock did not qualify as a reorganization because the petitioners failed to maintain a sufficient equity interest in McDonald's after the exchange. The petitioners bear the burden of proving the Commissioner's determination to be erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure.[6]

It is well settled that, in addition to meeting specific statutory requirements, a reorganization under section 368(a)(1)(A) must also satisfy the continuity of interest doctrine. See sec. 1.368-1(b), Income Tax Regs. The continuity of interest doctrine has developed from the fundamental principle of tax law that the substance of a transaction, and not its form, controls its tax consequences. See *Redding v. Commissioner*, 630 F.2d 1169, 1175 (7th Cir. 1980), revg. on other grounds 71 T.C. 597 (1979); see also *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *Gregory v. Helvering*, 293 U.S. 465, 469-470 (1935). Because the reorganization provisions are based on the premise that the shareholders of an acquired corporation have not terminated their economic investment, but have merely altered its form, the continuity of interest doctrine limits the favorable nonrecognition treatment enjoyed by reorganizations to those situations in which (1) the nature of the consideration received by the acquired corporation or its shareholders confers a proprietary stake in the ongoing enterprise,[7] and (2) the proprietary interest received is definite and material and represents a substantial part of the value of the property transferred. See generally *Helvering v. Alabama Asphaltic Limestone Co.*, 315 U.S. 179 (1942); *LeTulle v.*

---

[6]Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

[7]The requirement that the acquired shareholders retain a proprietary interest in the continuing enterprise may be satisfied if such shareholders receive preferred or common stock of the acquiring corporation pursuant to the acquisition. See, e.g., *John A. Nelson Co. v. Helvering*, 296 U.S. 374 (1935); *Helvering v. Minnesota Tea Co.*, 296 U.S. 378 (1935).

*Scofield*, 308 U.S. 415 (1940); *John A. Nelson Co. v. Helvering*, 296 U.S. 374 (1935); *Helvering v. Minnesota Tea Co.*, 296 U.S. 378 (1935); *Pinellas Ice & Cold Storage Co. v. Commissioner*, 287 U.S. 462 (1933); see also sec. 1.368-2(a), Income Tax Regs.; B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.01, at 14-4 (4th ed. 1979).

The entire consideration received by the Penrods pursuant to the May 15, 1975, merger consisted of McDonald's common stock. Thus, the parties agree that, in form, the nature and amount of such consideration satisfied the continuity of interest test. However, they do not agree on the effect of the Penrods' subsequent actions.

The Commissioner argues that the acquisition and the subsequent sale of McDonald's stock by the Penrods was part of an overall plan to "cash out" their investment in the acquired corporations and that, therefore, the two events should be considered to be, in substance, one transaction. The consequence of his position would be to treat the petitioners as having received all cash on the date of the acquisition, and therefore, the acquisition would fail the continuity of interest test.[8] On the other hand, the petitioners argue that their decision to sell their McDonald's stock was based only upon events which occurred after the acquisition and that the acquisition and subsequent sale should therefore be treated as separate transactions.

The resolution of this issue turns on the application of the so-called step transaction doctrine. The step transaction doctrine is in effect another rule of substance over form; it treats a series of formally separate "steps" as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result. See B. Bittker & J. Eustice, *supra*, at 14-131; Mintz & Plumb, "Step Transactions in Corporate Reorganizations," 12 Inst.

---

[8]We observe that the Commissioner's determination affects more than the tax year in which the petitioners must recognize the gain on the sale of their McDonald's stock. The petitioners acquired their stock in most of their corporations on Jan. 1, 1975. If the acquisition is treated as a taxable event, the petitioners failed to retain such stock for the 6-month holding period then required to qualify for long-term capital gain treatment. Secs. 1222(3), 1223(1). Moreover, since most of such corporations were subch. S corporations, a holding that the acquisition did not qualify as a reorganization requires that the petitioners recapture on their individual Federal income tax returns depreciation and investment tax credits previously claimed with respect to such corporations. See secs. 47(a)(1), 1245(a)(1).

on Fed. Tax. 247-248 (1954). There is no universally accepted test as to when and how the step transaction doctrine should be applied to a given set of facts. Courts have applied three alternative tests in deciding whether to invoke the step transaction doctrine in a particular situation.

The narrowest alternative is the "binding commitment" test, under which a series of transactions are collapsed if, at the time the first step is entered into, there was a binding commitment to undertake the later step. See *Commissioner v. Gordon*, 391 U.S. 83, 96 (1968); see also *United States v. Adkins-Phelps, Inc.*, 400 F.2d 737 (8th Cir. 1968); *Ward v. Commissioner*, 29 B.T.A. 1251 (1934). The binding commitment test has the advantage of promoting certainty in the tax planning of shareholders. Under such test, a court must make an objective determination as to whether the acquired shareholders were bound by an obligation to sell the shares received in an acquisition. Other factors, such as intent by such shareholders to sell their shares, are not considered. However, there have been objections to that test on the ground that the result is easily manipulable by taxpayers. As the court observed in *King Enterprises, Inc. v. United States*, 189 Ct. Cl. 466, 477, 418 F.2d 511, 518 (1969), "the step transaction doctrine would be a dead letter if restricted to situations where the parties were *bound* to take certain steps." (Emphasis in original).[9]

At the other extreme, the most far-reaching alternative is the "end result" test. Under this test, the step transaction doctrine will be invoked if it appears that a series of formally separate steps are really prearranged parts of a single transaction intended from the outset to reach the ultimate result. See *King Enterprises, Inc. v. United States*, 418 F.2d at 516; see also *Helvering v. Alabama Asphaltic Limestone Co.*, *supra*; *South Bay Corp. v. Commissioner*, 345 F.2d 698 (2d Cir. 1965); *Morgan Manufactur-*

---

[9] A study sponsored by the American Law Institute proposes to reform the tax treatment of corporate reorganizations entirely. See Wolfman, " 'Continuity of Interest' and the American Law Institute Study," 57 Taxes 840 (1979). Such proposal would allow a corporation to elect to take either a carryover or a cost basis for assets received in an acquisition. Under the ALI proposal, the acquired shareholders receive deferred recognition of gain or loss for exchanges of stock pursuant to an acquisition. Such treatment would be allowed without regard to any continuity of interest and would not depend on whether the acquiring corporation elected a carryover or cost basis for the acquired assets.

*ing Co v. Commissioner*, 124 F.2d 602 (4th Cir. 1941); *Heintz v. Commissioner*, 25 T.C. 132 (1955); *Ericsson Screw Machine Products Co. v. Commissioner*, 14 T.C. 757 (1950). The end result test is based upon the actual intent of the parties as of the time of the merger. It can be argued that any test which requires a court to make a factual determination as to a party's intent promotes uncertainty and therefore impedes effective tax planning. However, in contrast to the binding commitment test, the end result test is flexible and bases tax consequences on the real substance of the transactions, not on the formalisms chosen by the participants.[10]

The third test is the "interdependence" test, which focuses on whether "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." *Redding v. Commissioner*, 630 F.2d at 1177; see also *Kass v. Commissioner*, 60 T.C. 218 (1973), affd. without published opinion 491 F.2d 749 (3d Cir. 1974); *Farr v. Commissioner*, 24 T.C. 350 (1955); *American Wire Fabrics Corp. v. Commissioner*, 16 T.C. 607 (1951); *American Bantam Car Co. v. Commissioner*, 11 T.C. 397 (1948), affd. 177 F.2d 513 (3d Cir. 1949). This test concentrates on the relationship between the steps, rather than on their "end result." See *Security Industrial Insurance Co. v. United States*, 702 F.2d 1234, 1245 (5th Cir. 1983). However, since the interdependence test requires a court to find whether the individual steps had independent significance or whether they had meaning only as part of the larger transaction, the court may be called upon to determine the result the participants hoped to achieve. Thus, the interdependence test is a variation of the end result test.

Courts have applied each of these three alternatives to a variety of transactions to determine whether the transactions should be "stepped." In *Heintz v. Commissioner*, 25

---

[10]This Court has, in other circumstances, looked beyond the formalities chosen by the parties to characterize a transaction according to its economic and business realities. For example, we will disregard the amount of the purchase price of a business which the parties allocate to goodwill or a covenant not to compete, where the taxpayer presents "strong proof" that such allocation does not reflect the substance of the agreement between the participants. See, e.g., *Throndson v. Commissioner*, 457 F.2d 1022 (9th Cir. 1972), affg. *Schmitz v. Commissioner*, 51 T.C. 306 (1968); *Levine v. Commissioner*, 324 F.2d 298 (3d Cir. 71963), affg. a Memorandum Opinion of this Court.

T.C. 132 (1955), this Court considered whether to step the transactions in an acquisitive reorganization. In *Heintz*, the taxpayers were stockholders in Jack & Heintz, a manufacturer of arms and ammunition during World War II. At the war's end, it was determined that the business should be sold, rather than to try to reorganize its production for peacetime. It was sold to the Precision Corp., which had been formed to acquire Jack & Heintz. On March 5, 1946, Precision acquired almost all the outstanding shares of Jack & Heintz from the taxpayers for $5 million in cash and 60,000 shares of $50 par value preferred stock of Precision. On March 6, 1946, Precision merged its newly acquired subsidiary with itself. At the time the deal was being negotiated, two of the parties representing the buyers assured the taxpayers that the Precision shares to be received by them as part payment would be sold in a public offering planned for 30 days after the merger. Such promise was not memorialized in the 35-page written agreement covering the whole transaction. Due to unforeseen delays, the contemplated registration and sale of the preferred shares did not occur, but the buyers helped arrange a private sale at which the taxpayers sold their stock for $30 per share in August 1946. The Court applied the step transaction doctrine and held that no reorganization occurred. The Court found that:

The terms of the instant plan did not contemplate the petitioners' maintenance of a proprietary interest in the continuing corporation. * * * [P]etitioners wished to dispose of their entire interest in Jack & Heintz, Inc. * * * [T]hey settled for cash plus preferred stock * * * only after obtaining the promise of the promoters of * * * [the] purchasing corporation that their preferred stock in that corporation would be sold together with a public offering of that corporation's stock within 30 days. * * * [25 T.C. at 142-143.]

Thus, the Court placed little weight on the absence of a binding commitment on the part of the taxpayers to sell the preferred shares received by them in the acquisition. Instead, the Court focused on the facts that the taxpayers wished to "cash out" their investment in Jack & Heintz and that the acquisition was a step toward that goal.

More recently, the Court considered the step transaction doctrine in connection with an acquisition by McDonald's of

a number of franchised restaurants in a statutory merger similar in form to the transaction in the present case. *McDonald's of Zion v. Commissioner*, 76 T.C. 972 (1981). In that case, a group of individuals led by Messrs. Garb and Stern (the Garb-Stern group) owned and operated McDonald's restaurants under franchise agreements with McDonald's Corp. In 1968, McDonald's began negotiating to acquire such restaurants. However, the negotiations soon broke down, as a major problem arose concerning the form of payment. The Garb-Stern group wished to sell its stock only for cash, whereas McDonald's wanted to acquire the group's holdings in exchange for stock, so that it could treat the acquisition as a "pooling of interests" for financial accounting purposes.

In March 1973, the parties to those negotiations reached an agreement, whereby McDonald's agreed to acquire the Garb-Stern companies in exchange for McDonald's unregistered common stock and to allow the Garb-Stern group to include such stock in a proposed June 1973 registration. Under this plan, McDonald's could account for the acquisition in accordance with the pooling of interests method, and the Garb-Stern group could promptly obtain cash for its investment.

The Garb-Stern companies were merged into McDonald's on April 1, 1973, and the Garb-Stern shareholders received shares of McDonald's unregistered common stock. However, because of a weak market for its shares, McDonald's postponed the planned June 1973 registration. After the price of its stock recovered, McDonald's completed a similar registration and sale on October 3, 1973, and the Garb-Stern shareholders registered and sold virtually all of their McDonald's stock received in the merger.

McDonald's treated the merger as a purchase for tax purposes and claimed a cost basis for the assets acquired from the Garb-Stern group. The Commissioner determined that the acquisition was a reorganization under section 368(a)(1)(A) and that therefore McDonald's was only entitled to a carryover basis for the Garb-Stern assets. The Court first found that the facts "when viewed in a realistic and objective manner, portray the direct and unwavering intent of the Garb-Stern group to sell virtually all of the

McDonald's stock they received pursuant to the merger." 76 T.C. at 990. The Court also found that "the two transactions were independent. The merger transaction did not require or commit the Garb-Stern group to sell their McDonald's stock." 76 T.C. at 998; fn. ref. omitted. Consequently, this Court held that there was no binding commitment by the Garb-Stern group to sell their stock when it was acquired, that the steps were not mutually interdependent, that the step transaction doctrine was not applicable, that the Garb-Stern group did intend to continue to hold a proprietary interest in McDonald's, and that the acquisition constituted a reorganization within the meaning of section 368(a)(1)(A).

The Seventh Circuit reversed, holding that the merger and subsequent sale should have been stepped together. *McDonald's Restaurants of Illinois v. Commissioner*, 688 F.2d 520, 524 (7th Cir. 1982). The Circuit Court pointed to "the history of the parties' relationships, the abortive attempt to buy some of the group's holdings, the final comprehensive deal, and the Garb-Stern group's determination to sell out even in the face of falling prices in the stock" as indicative that "there can be little doubt that all the steps were taken to cash out the Garb-Stern group." 688 F.2d at 524; fn. ref. omitted. That court also observed:

This is the test [the interdependence test] the Tax Court purported to apply, 76 T.C. at 997-999, although its version of the test is indistinguishable from yet another formulation, the "binding commitment" test. That is, the Tax Court would have found interdependence only if the Garb-Stern group had itself been legally bound to sell its stock. In fact, the "interdependence" test is more practical and less legalistic than that. It concentrates on the relationship between the steps, rather than on the "end result" * * * . Here it would ask whether the merger would have taken place without the guarantees of saleability, and the answer is certainly no. * * * [688 F.2d at 524.]

The Circuit Court also believed that the facts "are enough to satisfy the spirit, if not the letter, of the 'binding commitment' test." 688 F.2d at 525. Finally, the Seventh Circuit held that the result in the case was controlled by *Heintz v. Commissioner, supra,* and viewed this Court's attempt to distinguish *Heintz* as unpersuasive. See 688 F.2d at 527.

In the present case, there was no binding commitment by the Penrods at the time of the acquisition to sell their stock. However, we need not decide whether the absence of a binding commitment, standing alone, is sufficient to prevent the application of the step transaction doctrine; after carefully examining and evaluating all the circumstances surrounding the acquisition and subsequent sale of the McDonald's stock received by the Penrods, we have concluded that, at the time of the acquisition, the Penrods did not intend to sell their McDonald's stock and that therefore the step transaction doctrine is not applicable under either the interdependence test or the end result test. See *Helvering v. Alabama Asphaltic Limestone Co.*, *supra*; *South Bay Corp. v. Commissioner*, *supra*; *Farr v. Commissioner*, *supra*.

In this case, Jack was unquestionably the leader of the Penrod group. He owned not less than 60 percent of the outstanding stock of each of the Penrod corporations at the time of the acquisition. Further, Jack was solely responsible for negotiating the terms of the agreement with McDonald's, and the petitioners appointed him as their agent to negotiate the terms of the sale of their McDonald's shares. Thus, we shall focus our analysis on the intention of Jack at the time of the acquisition and subsequent sale of McDonald's stock.

The Commissioner argued vigorously that Jack intended to sell his McDonald's stock when he acquired it because he planned to organize Wuv's, a competing fast-food restaurant chain. The evidence shows that Jack began thinking about a fast-food restaurant to be named Wuv's in 1974. At that time, he was enough interested in the idea to employ an attorney to research the trademark. Yet, he was then engaged in operating 16 McDonald's restaurants, and there is absolutely no evidence that he planned to sell or otherwise terminate his interest in those McDonald's restaurants at that time. In fact, Jack testified that it was the president of McDonald's who first mentioned the possibility of McDonald's acquiring the restaurants in February 1975. Jack did not initiate the proposal to exchange the stock of the Penrod corporations for McDonald's stock; it was McDonald's that took the initiative. Moreover, Jack never

asked for cash for his restaurants. McDonald's proposed to issue unregistered common stock in exchange for the stock of the Penrod corporations, and Jack never questioned that proposal. This evidence shows that, at the outset, Jack expected to operate his Wuv's restaurants without any liquidation of his interest in McDonald's.

In March 1975, the deal was struck—Jack and the management of McDonald's agreed on the exchange and on the amount of McDonald's stock to be issued for the Penrod stock. Only the details of the agreement remained to be worked out by the lawyers. Hence, in March 1975, Jack knew that he was going to terminate his operation of the restaurants to be acquired by McDonald's. He then, with Bob's assistance, apparently moved ahead on his plans to organize Wuv's, and on the day after the closing of the acquisition agreement, he arranged for the incorporation of Wuv's. He had approximately 2 months to make such arrangements after the deal was struck with McDonald's. Yet, while the agreement was being negotiated, Jack led his lawyers to understand that he intended to continue to hold the McDonald's stock to be acquired.

In August 1975, the Penrods could have demanded registration of their McDonald's stock, but they did not. In October 1975, Jack arranged to borrow $2 million from the Dania Bank to finance the operations of the Wuv's restaurants. Before securing such loan, Jack calculated that he could open 30 restaurants with $1,500,000 of funds supplied by him. Such estimates may, or may not, have been realistic, but there is no dispute over the fact that Jack made such calculations and believed that such funds would be sufficient to open the Wuv's restaurants. In connection with the loan from the Dania Bank, Jack's representative advised the bank that Jack planned to sell enough of his McDonald's stock to pay off $1 million of his loans and to pay his taxes on the sale. He then planned to retain approximately $2 million of the McDonald's stock. This evidence reveals that by October 1975, Jack had decided to sell some of his McDonald's stock; yet, if the evidence correctly reflects his intention at the time, he would have retained enough of the McDonald's stock to constitute a substantial interest in McDonald's, and the continuity of

interest requirement would have been satisfied. See, e.g., *John A. Nelson Co. v. Helvering, supra; Helvering v. Minnesota Tea Co., supra.*

We do not know why the Penrods did not demand registration of their McDonald's stock at the earliest opportunity; we do know that the value of the stock was depressed in August 1975 (approximately $44 a share) and that the value had risen to $58 a share on November 11, 1975. On that day, the Penrods took the first public action to sell their McDonald's stock. At the outset, they planned to sell 60,000 shares, but by December 1975, they increased the number to 96,554. In December, the value of the stock had dropped slightly, but the general trend was upward. They received $60 a share for the stock when it was sold in January 1976. It may be that by the fall of 1975, Jack decided to sell his McDonald's stock in part because he wanted the funds to open the Wuv's restaurants and in part because the market for the stock was favorable. Yet, a review of the record of events that occurred in 1975 supports Jack's testimony that he did not intend to sell his McDonald's stock when he acquired it and that he expected to be able to continue to hold that stock and to operate the Wuv's restaurants simultaneously.

In addition, Bob, Chuck, and Ron all testified that they intended to hold the McDonald's stock when they acquired it, and the circumstances corroborate their testimony. They all continued to work for McDonald's, and each of them hoped to acquire his own McDonald's franchise. Conflicts between them and McDonald's, particularly involving Bob, resulted in the relationship between them and McDonald's souring. In time, they either left McDonald's or were fired. The record of those events supports the testimony that they intended to hold the stock when it was acquired and that their decision to sell it arose because of subsequent events.

Disputes also developed between Jack and McDonald's after the acquisition. Jack hired some of the key employees from McDonald's and opened competing restaurants. McDonald's took the position that such activities constituted violations of the provisions of the acquisition agreement. Those disputes were eventually settled. If they have

any bearing on the issue before us, they tend to support the conclusion that the decision by Jack to sell was an independent transaction.

For these reasons, we have concluded that Jack and the other Penrods intended to continue to hold the McDonald's stock acquired by them in the acquisition. Accordingly, in our judgment, the acquisition of the stock and its subsequent sale were not interdependent steps, nor were they steps in a plan the end result of which was to cash out their interests in the restaurants. Under such circumstances, we hold that such transactions should not be stepped together, that the Penrods' ownership of the McDonald's stock satisfied the continuity of interest requirement, and that the acquisition of such stock constituted a reorganization within the meaning of section 368(a)(1)(A). Thus, we hold here (as did this Court in *McDonald's*, but on a different factual record) that there was a continuity of interest. In addition, since we have found as a fact that the acquired shareholders intended to continue to hold the stock acquired by them, and since the record fully supports that factual conclusion, we believe that our opinion here is factually distinguishable from that of the Seventh Circuit in the *McDonald's* case.

The next issue for our decision is whether the petitioners are entitled to deduct their distributive shares of the partnership losses of NIDF II claimed by them in 1976 and 1977. The petitioners claim that they invested in NIDF II in 1976 and that NIDF II became involved in a multi-tiered partnership arrangement in that year. They contend that NIDF II was a limited partner in Duo and that Duo acquired a partnership interest in three other limited partnerships: Environmental, Arlington Associates, and WRW LTD. It was planned that losses claimed by the three partnerships would flow through Duo to NIDF II for distribution to each of the petitioners. However, the Commissioner determined that the petitioners failed to establish that they were partners in NIDF II during the years in issue. The petitioners bear the burden of proving that they were in fact partners and should be recognized as such. Rule 142(a); *Cirelli v. Commissioner*, 82 T.C. 335, 342 (1984).

The determination that a party has acquired an interest in a partnership must be based upon all the facts and circumstances of each case. See sec. 1.704-1(c), Income Tax Regs.; *Ketter v. Commissioner*, 70 T.C. 637, 643 (1978), affd. without published opinion 605 F.2d 1209 (8th Cir. 1979). Acquisition of a partnership interest requires more than the creation of a paper interest. *Cirelli v. Commissioner, supra* at 343. A person may be recognized for income tax purposes as a partner in a partnership, such as NIDF II, in which capital is a material income-producing factor if he owns a capital interest in such partnership. Sec. 704(e). Thus, the question becomes whether the petitioners owned a capital interest in NIDF II for purposes of section 704(e).

The petitioners acknowledge that they did not make direct investments in NIDF II. However, they testified at trial that they transferred funds to Jack and that Jack in turn acted as a conduit by transferring such funds to the partnership. In our judgment, such testimony and the scant documentary evidence in the record was unpersuasive. For such reason, we conclude that the petitioners have failed to carry their burden of proof as to the alleged partnership interests.

Ron and Chuck offered only their testimony at trial to prove that they made payments to Jack to be invested in NIDF II. Ron testified that he sent at least two checks to Jack, in the amounts of $20,000 and $12,000. However, Ron was unable to produce copies of such checks nor recall the date the moneys were sent. Ron testified that he refused to pay the bank fees required to secure the canceled checks to substantiate his claim. In addition, he was unable to recall the name of the partnership in which he allegedly invested. Finally, Peter Bonitatibus, who handled all the Penrods' financial affairs, testified that his records did not indicate that Jack received any money from Ron. Chuck also failed to produce tangible evidence of his investment in NIDF II. He exhibited little familiarity with such investment.

Bob produced two checks totaling $100,000 written to Jack. Such checks were processed through the Jack Penrod Real Estate account. While such checks support Bob's testimony regarding his investment in NIDF II, we are not persuaded that such investment occurred. The checks con-

tain no indication as to their purpose, except for the notation "Apts" in the corner of one check. In our judgment, such a cryptic reference fails to satisfy the petitioners' burden of proving that the Commissioner's determination was erroneous.

The petitioners' claims are further undermined by the testimony of other witnesses. The organizer of NIDF II, Stephen Moses, testified that he had never heard of any of the petitioners. Peter Bonitatibus, the controller of Penrod Management and Jack's personal accountant, testified from his daily logbook that "I don't believe there's anything in there that says—we made our investments to NIDF." Finally, even Jack was unsure about his involvement with NIDF II. When asked how he paid for the investment in the partnership, he replied, "I believe that I paid for them, and the brothers paid me, I believe."

During the proceeding, the Commissioner's counsel sought to introduce into the record numerous documents relating to the partnership losses claimed by Duo and NIDF II and to the alleged transfer of funds through Jack to NIDF II. A subpoena duces tecum was issued to the counsel who represented Jack in connection with the investments in NIDF II. The counsel appeared and had with him his legal files relating to such investments. However, Jack claimed his privilege not to have the attorney disclose such records, and the Court recognized the right to claim the privilege and not to have the records produced. The petitioners argue that Jack had the right to claim the privilege and that they were not in a position to influence him otherwise; they also contend that the Court should draw no inference from the claim of the privilege. Unif. R. Evid. 512 (1986); 8 J. Wigmore, Evidence, sec. 2322 (McNaughton rev. 1961).

It is not necessary for us to decide whether a negative inference is to be drawn from the refusal to produce the documents. See C. McCormick, Evidence, sec. 74.1 (E. Cleary 3d ed. 1984); 8 J. Wigmore, *supra* at sec. 2322. Even if we do not draw a negative inference from the failure to produce the documents, we are left with the situation that the petitioners had the burden of proving that they made investments in NIDF II, and they produced only vague and unpersuasive evidence of such investments. The withheld

records might, or might not, have supported their position. Surely, without seeing them, we cannot infer that such records would have supported their claims. Thus, the petitioners must stand on the evidence that they did present, and that evidence is insufficient to carry their burden of proof.

The petitioners next argue that, in the event that we hold that they did not invest in NIDF II, Jack made a gift to them of partnership interests in such partnership. However; there is absolutely no evidence in the record to support such a claim. Neither Jack, Peter Bonitatibus, nor any of the petitioners ever mentioned such a gift in their testimony at trial. Moreover, certain documentary evidence might have supported their contention. For example, Jack's Federal income tax returns for 1976 and 1977 might have shown that Jack's partnership share in NIDF II was less than he purchased by his investment in NIDF II. Yet, the petitioners failed to introduce any such documents into evidence. We conclude that the petitioners have again failed to carry their burden of proof with respect to this issue.

Having found that the petitioners have failed to establish that they were partners in NIDF II in 1976 and 1977, we need not consider the Commissioner's other arguments.

*Decisions will be entered under Rule 155.*

