**PURSUANT TO INTERNAL REVENUE CODE SECTION 7463(b),THIS OPINION MAY NOT BE TREATED AS PRECEDENT FOR ANY OTHER CASE.**

T.C. Summary Opinion 2014-43


UNITED STATES TAX COURT


MOHAMED KADIR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15809-12S.                    Filed May 6, 2014.


<u>Kathryn J. Sedo</u>, for petitioner.[1]

<u>Blaine Charles Holiday</u> and <u>John Schmittdiel</u>, for respondent.


SUMMARY OPINION


   HOLMES, <u>Judge</u>:  In 2006 Mohamed Kadir refinanced his home mortgage.

He at first made his payments on time, but those payments kept going up.  He

_____

   [1] The Court acknowledges the excellent *pro bono* effort of petitioner's
counsel from the University of Minnesota Law School's Ronald M. Mankoff Tax
Clinic in this case.

thought the mortgage company had lied to him, and he sued for fraud. He settled his case. One of the terms of the settlement agreement required the mortgage company to pay him $10,000, and another required him to pass the $10,000 to two mortgage-service companies. The mortgage company told the Commissioner that it had paid Kadir $10,000, and the Commissioner wants Kadir to pay tax on it. Kadir argues that it wasn't really his income since he had to pass it on to the mortgage-service companies.[2]

## Background

In 2001, Mohammed Kadir and his brother bought a home in Brooklyn Park, Minnesota for $141,000. While both brothers' names were on the title, for a few years it was Kadir's brother who made sure the monthly mortgage bill got paid. In 2004, however, he transferred his interest in the home to Kadir when they went through a refinancing, and Kadir then started paying the mortgage bill himself.

Less than two years later, in August 2006, Kadir decided to refinance his mortgage again to try to lower his monthly payments. As a nonnative English

---

[2] This case was tried under Internal Revenue Code section 7463. Since Kadir chose small-case status, the decision isn't reviewable by any other court, and this opinion shouldn't be cited as precedent. Unless we say otherwise, all section references are to the Code in effect for the year at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

speaker (at trial the court used a translator who spoke Kadir's native Oromo),

Kadir relied heavily on agents at GreenPoint Mortgage Funding, LLC

(GreenPoint). He ended up with two mortgages, and GreenPoint originated both.

But each of the new mortgages had a different mortgage servicer. The first

mortgage--for $172,000--used GMAC Mortgage, LLC (GMAC) as its servicer.

The second mortgage--for $21,500--used Specialized Loan Servicing, LLC (SLS).

These two mortgages totaled $193,500. Most of the loan proceeds went to

pay off the 2004 mortgage, but Kadir kept a little less than $11,000. And even

though the total loan principal had increased, Kadir credibly testified that his

purpose in refinancing was to "reduce the [mortgage] payment per month." But

once all the refinancing was done, his monthly payments continued to rise. Kadir

kept paying, but he was confused and frustrated after numerous attempts to clear

up why his payments kept going up.[3] The record is not entirely clear as to how

much the monthly mortgage payments had increased by early 2009, but by that

---

[3] Though he was making "minimum payments" on his mortgages, the folks who "helped" Kadir refinance failed to adequately explain the concept of a negatively amortizing mortgage. The monthly payment that stops a negatively amortizing mortgage from increasing the principal amount of the debt is often well above the minimum payment that the mortgage requires. The record doesn't show any attempts by the mortgage or servicing companies to explain to Kadir the effects of making only the minimum payments on his loans (which, in part, was the basis for the fraud case Kadir started in 2009). And the Court directly observed the difficulty of translating "negative amortization" into Oromo.

point Kadir had had enough and stopped paying altogether. That summer Kadir talked to lawyers at the Housing Preservation Project, a nonprofit in St. Paul, and they helped him sue GreenPoint, GMAC, and SLS in October.

Kadir said he had three reasons for suing the companies:

- common-law fraud, meaning that the companies had lied to him when they promised his payments would go down;

- a Minnesota state law called the Minnesota Prevention of Consumer Fraud Act, see generally Minn. Stat. Ann. sec. 325F.68-325F.70 (West 2014), that stops companies from committing any "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice;" and

- the Federal Truth In Lending Act, see generally 15 U.S.C. secs. 1601, which has as its goal to "assure a meaningful disclosure of credit terms * * * and to protect the consumer against inaccurate and unfair credit billing."

The companies moved the case to federal court because Kadir was suing in part under a federal law. The parties then met with a magistrate judge to try to settle the case. This worked, and Kadir got his debt--both interest and principal-- reduced to what he could afford. The settlement agreement, however, was long and not easy to understand even for someone who spoke English, and it must have been even harder for Kadir. And what this case is about is a very unusual part of that settlement. It was a promise by GreenPoint in one section of the settlement to give Kadir a check for $10,000. But another section of the settlement told Kadir

that he had to pay GMAC $5,700 "by assignment of $5,700.00 from the Borrower's (Kadir) GreenPoint Payment," and to pay SLS $4,300 "by assignment of $4,300.00 from the Borrower's GreenPoint Payment."

After everyone signed the settlement, GreenPoint kept its promise and sent a check for $10,000 to Kadir's attorney, Martin Carlson. Carlson then told Kadir to take the check to the bank and get two new checks--a $5,700 check for GMAC and a $4,300 check for SLS. Kadir did what Carlson told him, and Carlson then sent these new checks to GMAC and SLS.

Then Kadir's tax trouble began. Kadir got a Form 1099-MISC, Miscellaneous Income, for his 2010 tax year. The 1099-MISC said that the $10,000 payment made out to Kadir was nonemployment compensation. GMAC and SLS also sent Kadir Forms 1099-C, Cancellation of Debt. These forms said that Kadir had more than $35,000 in canceled debt--and the general rule is that canceled debt and nonemployment compensation are taxable income. Kadir didn't list either of these numbers on his tax return as income for 2010.

The Commissioner sent Kadir a notice of deficiency in March 2012. It stated only that he owed tax on the $10,000 that he received from GreenPoint. So Kadir's case comes down to this: The IRS says Kadir should have reported

$10,000 of miscellaneous income; and Kadir says that this money was intended for GMAC and SLS, and not for him, so he shouldn't have to pay tax on it at all.[4]

### Discussion

The Code includes everything in income. Sec. 61. Except when it doesn't. See generally subch. B, p. III, Items Specifically Excluded From Gross Income. And the Code isn't always perfectly clear, so courts have established rules as well. An old case, Raytheon Prod. Corp. v. Commissioner, 144 F.2d 110 (1st Cir. 1944), aff'g 1 T.C. 952 (1943), was one of the first to discuss how the IRS should tax money that a taxpayer gets when he settles a lawsuit. And Raytheon and similar cases tell us to ask: "[I]n lieu of what were the damages awarded?" Id. at 113. We know that Kadir sued for the tort (a kind of legal wrong) of fraud, but that alone doesn't answer the question.

The Commissioner argues that "[s]ettlement proceeds are included in the broad definition of income * * * unless they are damages received on account of personal injuries or sickness." Worsham v. Commissioner, T.C. Memo. 2012-219, slip op. at 8-9, aff'd, 531 Fed. Appx. 310 (4th Cir. 2013). Worsham does say this, but it is very important to understand what we were deciding in that case. The

---

[4] The IRS raised the cancellation-of-debt issue only at trial, which we ruled was too late. And the parties settled some other minor issues, making computations necessary.

taxpayer in <u>Worsham</u> was making silly "tax protester" arguments. These kinds of arguments never win, and we don't even spend much time discussing them because we've rejected them over and over. So when we were saying why the taxpayer in <u>Worsham</u> was losing, we were not making a general rule of when money a taxpayer gets in settling a case is taxable--we were deciding only one taxpayer's case. We can think of a number of situations where settlement proceeds would not be taxable (e.g., a lawsuit to collect tax-free municipal bond interest).[5]

So what we need to do is find cases that are more like this one than <u>Worsham</u>. Kadir helps us to do this by making one very important point: the settlement agreement required him to take the $10,000 check, and from that payment write out checks to GMAC and SLS that added up to $10,000. Kadir argues that this strange provision in the settlement agreement means that he's like a mailman who picks up an envelope with a $10,000 check in it and then delivers it to its final address. Nobody would ever accuse the mailman of not reporting $10,000 of income if this happened.

---

[5] Kadir himself gave us another example--where a builder wins a settlement in a construction case, and doesn't have to pay tax on it because the settlement reduces the cost (or basis, to use the tax word) of his building.

There are a lot of cases in tax law that use a rule called the "step transaction doctrine." This rule tells a court to treat two steps as if they were really only one when the parties involved have a "binding commitment" to take both steps. There's even a very old case from Minnesota about this rule--back in 1938, the Supreme Court, in Minn. Tea Co. v. Helvering, 302 U.S. 609 (1938), looked at a deal in which the Minnesota Tea Company sold everything it owned and sent the money to its shareholders. The shareholders would normally have to pay tax on this, but part of the deal in the tea company's case was that the shareholders all promised to use the money to pay the company's debts to other people. The Supreme Court said this amounted to the company's paying its own debts as far as tax law was concerned: "A given result at the end of a straight path is not made a different result because reached by following a devious path." Id. at 613. The Tax Court follows this same rule. See, e.g., Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987).

So the question is whether the settlement agreement required GreenPoint to pay Kadir and Kadir to pay GMAC and SLS. The answer is easy: Kadir didn't get to just take the $10,000; the settlement agreement told him to pay $5,700 GMAC and $4,300 to SLS, by "assignment of [$5,700 and $4,300] from the Borrower's GreenPoint payment." This means that the money going to GMAC and SLS was

the same money paid to Kadir. As his lawyer told him, he *had* to do this according to the settlement agreement. That made it a "binding commitment."

We want to be careful to explain that almost every rule has exceptions. If Kadir owed $10,000 to someone else, and the settlement agreement said that Greenpoint would pay Kadir's debt, then tax law would probably treat the $10,000 first as income to Kadir and then Kadir's paying the debt himself. But that's not what we have here--no one argues that Kadir himself owed anything to GMAC or SLS because of the lawsuit. We do note that the settlement agreement says that Kadir's promise to send $5,700 to GMAC and $4,300 to SLS would "fully satisfy" the two mortgage loans from Greenpoint that GMAC and SLS were servicing. This might make those payments a condition for Kadir's getting income in the sense that his big mortgage debt was being partly canceled, but we've already said that the IRS made this argument too late, and we are struck by the fact that the promised payments have no relation to the amounts of the two loans that Kadir was getting out of and by the fact that the promised payments were going to GMAC and SLS, and not to Greenpoint. We believed Kadir's lawyer from the Housing Preservation Project when he testified that GMAC and SLS were very concerned with how the settlement would be divided. He told us that "there was this money that [Greenpoint] had to contribute, but all of the discussions related to

what happened to that money happened between [GMAC and SLS] in terms of how it was going to get apportioned." We're convinced that the settlement was intended to get some money from Greenpoint to GMAC and SLS--even if $10,000 went into Kadir's account for a moment--because GMAC and SLS were losing the money that GreenPoint would have paid them if GreenPoint had not reduced the amounts, and changed the terms, of Kadir's mortgages.

We therefore find that Mohamed Kadir did not have $10,000 of unreported income for 2010.

Decision will be entered

under Rule 155.