# United States Tax Court

T.C. Memo. 2024-89

ESTATE OF LARRY BECKER, DECEASED, GARY C. BECKER,
EXECUTOR,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 10166-20.                    Filed September 24, 2024.

————

*Henry C. Cheng* and *Tamara L. Shepard*, for petitioner.

*Victoria E. Cvek*, *David A. Indek*, and *Nancy M. Gilmore*, for respondent.

## MEMORANDUM OPINION

NEGA, *Judge*: By Notice of Deficiency dated February 25, 2020, respondent determined a deficiency of $4,191,094 in decedent's estate tax liability for tax year 2016. The remaining[1] issues for decision are (1) whether decedent's gross estate should be increased by the value of death benefit proceeds from two life insurance policies pursuant to section(s) 2031[2] and/or 2042 and (2), if so, whether decedent's gross estate should be reduced by the amount of a related settlement under section 2053.

———

[1] Decedent's estate (Estate) does not contest respondent's increase to decedent's adjusted gift tax.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[*2]** By joint motion of the parties, this case was submitted fully stipulated for decision without trial, pursuant to Rule 122.

## *Background*

The following facts are based on the parties' pleadings and the parties' First Stipulation of Facts, including the attached Exhibits.

I.    *Decedent and Decedent's Estate*

Larry Becker (Dr. Becker) died unexpectedly in a car accident on January 8, 2016.

Gary C. Becker (Mr. Becker) is the executor of the Estate.  Mr. Becker is Dr. Becker's son.

II.    *The Trust*

On July 21, 2014, Dr. Becker created an irrevocable life insurance trust, the Larry Becker Irrevocable Family Trust (Trust), by executing a Trust Agreement.[3]

Dr. Becker's daughter, Jennifer Benscher, and Mr. Becker were the trustees of the Trust (collectively, Trustees).

The Trust Agreement named Dr. Becker's wife, Alma Cohen Becker; his children, Mr. Becker, Jill Becker, and Ms. Benscher; and his grandchildren the beneficiaries of the Trust.

The Trust Agreement was irrevocable, and Dr. Becker, as the grantor of the Trust, had relinquished all power to alter, amend, revoke, or terminate the Trust Agreement in any way.

Dr. Becker did not retain, nor did he have, any beneficial interest in the Trust, whether vested or contingent, nor did he have any reversionary interests or possibilities of reverter under the Trust.

Dr. Becker had no control over the administration or disposition of any assets held in the Trust under the Trust Agreement.

---

[3] Dr. Becker created several trusts, which included three irrevocable life insurance trusts: the Trust, the Larry Becker Life Trust created on October 15, 1992, and the Larry Becker Children's Trust created on October 28, 2001.

**[\*3]**   The Trust was created to hold assets for the benefit of the Trust's beneficiaries, including specifically life insurance policies on Dr. Becker's life.

Pursuant to the Trust Agreement, the Trustees may borrow on any insurance policy held under the Trust to pay any premiums due on such an insurance policy.

The Trust was set up in the State of Maryland and is subject to the laws of Maryland.

III.   *The Zurich Policies (Policy Nos. 1 and 2)*

A.   *Policy No. 1*

On July 25, 2014, Dr. Becker and the Trust, with the assistance of their counsel, Amy L. Stampfer, submitted an application for life insurance on Dr. Becker's life to Zurich American Life Insurance Co. (Zurich), proposing the Trust be the owner of the life insurance policy (July 25 Application).

In response to the question "Have you entered into, or have you made plans to enter into, an agreement to borrow current or future premiums or both, in connection with this Application for Individual Life Insurance?" in Section G of the July 25 Application, the box indicating "No" was checked.

In response to the question, "What is the purpose of insurance?" in Section J of the July 25 Application, the box for "Estate Planning" was checked.

In the Net Worth section of the July 25 Application, Dr. Becker listed $25 million of investments, $1,600,000 in investment property, and zero debt.

On the July 25 Application, Dr. Becker reported his salary as $700,000 and the value of his total assets and net worth as $29,500,000.

Dr. Becker and a medical examiner indicated on the July 25 Application that Dr. Becker was being treated only for high blood pressure and a few previous joint-related surgeries.

The July 25 Application resulted in the issuance of Zurich life insurance policy No. 184630 (Policy No. 1) on August 19, 2014.

**[\*4]**    Policy No. 1 was issued in Maryland.

The Trust was the sole owner of Policy No. 1.

The Trust was the sole beneficiary of Policy No. 1, as stated in the July 25 Application.

Barry Steinfelder was the insurance broker who assisted Dr. Becker and the Trust in connection with the procurement of Policy No. 1. Mr. Steinfelder earned a commission on the sale of Policy No. 1 equal to the first year's premium (i.e., $999,693).

Policy No. 1 had the total death benefit of $11,470,000 and required an initial premium of $999,693.

Policy No. 1 provided that the "Planned Periodic Premium" was $999,693, which was the target amount that the Trust intended to pay at a fixed interval, as shown on the Schedule Page.

Although the stated "Premium Frequency" shown on the Schedule Page for Policy No. 1 was "Annual," it "only serve[d] as an indication of [the Trust's] preference as to probable future frequency of payment," and the Trust was free to "change the frequency of Planned Periodic Premium payments at any time."

Policy No. 1 provided that the "Minimum Premium" was $400,485.14. For the first three years of the policy—the "Minimum Premium Period"—the Trust was "required to have paid cumulative premiums at least equal to the number of months from the Policy Date, multiplied by the Minimum Premium shown on the Schedule Page, divided by twelve." Because the Trust had paid $999,693 as the initial premium, the Minimum Premium requirement was satisfied for about 30 months (i.e., $999,693 divided by ($400,485.14 divided by 12)).

In addition to the Minimum Premium requirement, Policy No. 1 also provided that the premium required to continue the policy "is no more than that which results in a positive Policy Value on the date the Grace Period begins. That amount equals the current Monthly deductions plus the next two Monthly Deductions." The Policy Value for Policy No. 1 is determined by a formula provided in the policy document. The Monthly Deductions for any policy month were the cost of insurance charges plus the periodic expense charges for the policy and any riders or benefits.

[*5]    Dr. Becker was not the owner of Policy No. 1 at any time.

The terms of Policy No. 1 did not provide Dr. Becker or the Estate any (1) claim to the policy or its proceeds; (2) power to change the beneficial ownership in the policy or the time or manner of enjoyment of the policy or its proceeds; (3) power to change the beneficiary, surrender or cancel the policy, assign the policy, revoke an assignment, pledge the policy for a loan, or obtain from the insurer a loan against the surrender value of the policy; or (4) right to the economic benefits of the policy.

Under Policy No. 1, neither the Trust nor the Trustees were required or under any obligation to pay taxes, debts, or other charges enforceable against Dr. Becker's Estate.

B.    *Policy No. 2*

On September 5, 2014, Dr. Becker and the Trust, again with the assistance of Ms. Stampfer, submitted a second application for life insurance on Dr. Becker's life to Zurich, again proposing the Trust to be the sole owner as well as the sole beneficiary of the life insurance policy (September 5 Application).

In response to the question "Have you entered into, or have you made plans to enter into, an agreement to borrow current or future premiums or both, in connection with this Application for Individual Life Insurance?" in Section G of the September 5 Application, the box indicating "No" was checked.

In response to the question, "What is the purpose of insurance?" in Section J of the September 5 Application, the box for "Estate Planning" was checked.

In the Net Worth section of the September 5 Application, Dr. Becker listed $25 million of investments, $1,600,000 in investment property, and zero debt.

On the September 5 Application, Dr. Becker reported his salary as $700,000 and the value of his total assets and net worth as $29,500,000.

Dr. Becker and a medical examiner indicated on the September 5 Application that Dr. Becker was being treated only for high blood pressure and a few previous joint-related surgeries.

**[*6]** The September 5 Application resulted in the issuance of Zurich life insurance policy No. 187301 (Policy No. 2) on September 10, 2014.

Policy No. 2 was issued in Maryland.

The Trust was the sole owner of Policy No. 2.

The Trust was the sole beneficiary of Policy No. 2, as stated in the September 5 Application.

Mr. Steinfelder was the insurance broker who assisted Dr. Becker and the Trust in connection with the procurement of Policy No. 2. Mr. Steinfelder earned a commission on the sale of Policy No. 2 equal to the first year's premium (i.e., $697,257).

Policy No. 2 had the total death benefit of $8 million and required an initial premium of $697,257.

Policy No. 2 provided that the "Planned Periodic Premium" was $697,257, which was the target amount that the Trust intended to pay at a fixed interval, as shown on the Schedule Page.

Although the stated "Premium Frequency" shown on the Schedule Page for Policy No. 2 was "Annual," it "only serve[d] as an indication of [the Trust's] preference as to probable future frequency of payment," and the Trust was free to "change the frequency of Planned Periodic Premium payments at any time."

Policy No. 2 provided that the "Minimum Premium" was $279,327.04. For the Minimum Premium Period of three years, the Trust was "required to have paid cumulative premiums at least equal to the number of months from the Policy Date, multiplied by the Minimum Premium shown on the Schedule Page, divided by twelve." Because the Trust had paid $697,257 as the initial premium, the Minimum Premium requirement was satisfied for about 30 months (i.e., $697,257 divided by ($279,327.04 divided by 12)).

In addition to the Minimum Premium requirement, Policy No. 2 also provided that the premium required to continue the policy "is no more than that which results in a positive Policy Value on the date the Grace Period begins. That amount equals the current Monthly deductions plus the next two Monthly Deductions." The Policy Value for Policy No. 2 is determined by a formula provided in the policy document. The Monthly Deductions for any policy month were the cost of insurance

**[*7]** charges plus the periodic expense charges for the policy and any riders or benefits.

Dr. Becker was not the owner of Policy No. 2 at any time.

The terms of Policy No. 2 did not provide Dr. Becker or the Estate any (1) claim to the policy or its proceeds; (2) power to change the beneficial ownership in the policy or the time or manner of enjoyment of the policy or its proceeds; (3) power to change the beneficiary, surrender or cancel the policy, assign the policy, revoke an assignment, pledge the policy for a loan, or obtain from the insurer a loan against the surrender value of the policy; or (4) right to the economic benefits of the policy.

Under Policy No. 2, neither the Trust nor the Trustees were required or under any obligation to pay taxes, debts, or other charges enforceable against Dr. Becker's Estate.

C. *The Trust and the Zurich Policies*

At the time the applications for Policy No. 1 and Policy No. 2 (collectively, Zurich Policies) were made, Dr. Becker resided in Maryland.

The terms of the Trust Agreement provided that the Trustees "possess[ed] and own[ed] all the incidents of ownerships, rights, powers, interests, privileges and benefits of every kind that may accrue on account of any insurance policies" that were part of the Trust property, including the Zurich Policies.

D. *Funding of the Zurich Policies' Premiums*

1. *Initial Loans to Fund the Initial Premiums*

The initial premiums for the Zurich Policies were not submitted with the policy applications.

The Trust funded payment of the initial premiums for the Zurich Policies via borrowed funds from Dr. Becker, who in turn borrowed the same amounts from Mr. Steinfelder.

Mr. Steinfelder borrowed from an acquaintance, Dr. Julia Wen, $999,693 and $697,257 on August 20 and September 12, 2014, respectively.

**[\*8]**    Mr. Steinfelder gave Dr. Wen promissory notes dated August 20 and September 12, 2014, in return for the two loans, promising to repay the amounts borrowed along with interest at 1%.

The promissory note issued to Dr. Wen on August 20, 2014, lists the borrower as Mr. Steinfelder and is signed by Mr. Steinfelder.

The promissory note issued to Dr. Wen on September 12, 2014, lists the borrower as JJM, LLC, and is signed by Mr. Steinfelder.

JJM, LLC, is a single-member limited liability company organized by Mr. Steinfelder.

Mr. Steinfelder transferred $999,693 and $697,257 to Dr. Becker on August 22 and September 15, 2014, respectively.

Dr. Becker then deposited each of the amounts borrowed from Mr. Steinfelder, $999,693 and $697,257, into the escrow account maintained by Ms. Stampfer on behalf of the Trust on August 25 and September 16, 2014, respectively.

The initial premium of $999,693 for Policy No. 1 was paid to Zurich on August 26, 2014, via a wire transfer by Ms. Stampfer from the escrow account for the Trust.

The initial premium of $697,257 for Policy No. 2 was paid to Zurich on September 16, 2014, via a wire transfer from the escrow account for the Trust.

There is no memorialization or promissory note(s) showing Dr. Becker's loan to the Trust for the payment of the initial premiums for the Zurich Policies.

2.    *Transfer of the Trust's Initial Loans to JTR*

ALD, LLC (ALD), was a North Carolina limited liability company that Mr. Steinfelder controlled.

On August 29 and September 19, 2014, Mr. Steinfelder caused ALD to transfer $999,719.66 and $697,275.59, respectively, to Dr. Wen to repay Dr. Wen's loans to Mr. Steinfelder.

On August 29, 2014, the right to receive repayment from the Trust of the loan that funded the initial premium for Policy No. 1 was

**[\*9]** assigned and transferred to ALD as the payee of the loan pursuant to an Amended and Restated Promissory Note.

On September 19, 2014, the right to receive repayment from the Trust of the loan that funded the initial premium for Policy No. 2 was assigned and transferred to ALD as payee of the loan pursuant to a separate Amended and Restated Promissory Note (with the first Amended and Restated Promissory Note, collectively, ALD Notes).

Under the ALD Notes, the Trust was obligated to repay the funds that it borrowed to fund the initial premiums of the Zurich Policies to ALD. Dr. Becker had no right to receive any funds from the Trust as a result of the ALD Notes. The ALD Notes granted ALD first priority security interests in the Zurich Policies.

On December 31, 2014, the ALD Notes were assigned to JTR, LLC (JTR), a Delaware limited liability company (JTR Agreement). The ALD Notes were among more than a dozen unrelated obligations that ALD transferred to JTR.

3. *LT Funding's Loan to the Trust to Fund Future Premiums*

On December 15, 2014, Michael H. Smith and Ms. Stampfer, signing as the trustees of the Trust, entered into a Loan and Security Agreement with LT Funding, LLC (LT Funding), a Georgia limited liability company, and executed two promissory notes pursuant to this loan agreement. The agreement and associated promissory notes were secured with a security interest in the Zurich Policies (collectively, LTF Agreement).

The LTF Agreement provided that LT Funding was obligated to pay future premiums due on the Zurich Policies and that the Trust was obligated to pay LT Funding (i) seventy-five percent of the total death benefits of the Zurich Policies, (ii) all premiums advanced by LT Funding, and (iii) interest on all premiums advanced by LT Funding at the rate of six percent per year.

In order to continue each of the Zurich Policies, the Trust was required to pay (a) the Minimum Premium during the Minimum Premium Period and (b) the amount of premium required to maintain a positive Policy Value under each policy.

**[\*10]** As a condition of the Loan and Security Agreement, JTR, LT Funding, and Michael H. Smith and Ms. Stampfer signing for the Trust entered into two Subordination and Intercreditor Agreements on December 15, 2014.

Under the two Subordination and Intercreditor Agreements, each of the security interests in the Zurich Policies created by the ALD Notes was subordinated to a first priority security interest in favor of LT Funding.

No additional premiums were actually paid on the Zurich Policies by LT Funding before Dr. Becker's death.

### E.   *Payment of the Benefits from the Zurich Policies*

On March 14, 2016, following the death of Dr. Becker, Zurich paid death benefits from the Zurich Policies to the Trust of $11,489,797.22 for Policy No. 1 and $8,013,808 for Policy No. 2 after completing its own internal investigation.

A dispute arose between the Trust, on one hand, and various third parties, including Ms. Stampfer, Mr. Steinfelder, LT Funding, and ALD (collectively, Third-Party Claimants), on the other hand, as to which parties were entitled to the proceeds of the Zurich Policies.

Pursuant to the LTF Agreement, LT Funding claimed it was entitled to receive from the Trust $14,797,000 of the death benefits paid to the Trust under the Zurich Policies.

Pursuant to the JTR Agreement, JTR claimed it was entitled to receive from the Trust $1,820,428 of the death benefits paid to the Trust under the Zurich Policies.

The Trust and the Third-Party Claimants ultimately entered into a settlement agreement in October 2017, pursuant to which the Trust paid $9 million to LT Funding in exchange for release of the claims.

### IV.   *Tax Return and Notice of Deficiency*

On April 4, 2017, Mr. Becker, in his capacity as executor of the Estate, filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (Estate Tax Return) for the Estate.

**[*11]** The Estate Tax Return reported a prior payment of tax of $1,100,000.

The Estate Tax Return reported an overpayment in estate tax of $50,510.

The Estate Tax Return reported a gross estate of $12,571,537 that included, among other assets, $4,321,750 of retirement accounts listed in Schedule I, $7,241,396 of "Transfers During Decedent's Life" listed in Schedule G and the accompanying schedule, Dr. Becker's 50% interest in assets jointly held with his spouse of $1,227,320 listed in Schedule E, and "Miscellaneous Property" of $333,017 listed in Schedule F.

The Estate Tax Return also reported deductions that included, among others, a marital deduction of $3,721,814 listed in Schedule M. The Estate Tax Return reported no taxable gift in Part 2 of the return.

The Estate Tax Return reported that other beneficiaries (i.e., beneficiaries other than Dr. Becker's surviving spouse) received benefits from the Estate of $7,024,241.

Schedule D of the Estate Tax Return reported, inter alia, interests in the Zurich Policies.

Form 712, Life Insurance Statement, filed with the Estate Tax Return listed Dr. Becker as the insured on the following policies: a $2 million term policy owned by the Larry Becker Children's Trust issued February 14, 2002; a $2 million universal life policy owned by the Larry Becker Lifetime Trust issued March 22, 2011; and the two Zurich Policies.

The death benefits payable on the Zurich Policies were not included in the value of the gross estate on the Estate Tax Return.

On both the July 25 Application and the September 5 Application, Dr. Becker reported that he had other life insurance issued in 2004 through AXA with the face amount of $3 million (AXA Policy). The AXA Policy is not reported on Form 712 or listed on Schedule D of the Estate Tax Return.

On February 25, 2020, respondent issued a Notice of Deficiency for the Estate Tax Return to Mr. Becker.

**[\*12]** In the Notice of Deficiency, respondent determined a deficiency in estate tax liability for tax year 2016 of $4,191,094.

The deficiency in estate tax is based on the following adjustments:

1. Respondent increased the value of property listed on the Estate's Schedule F, Other Miscellaneous Property, by $19,470,000 based on the death benefit proceeds of the Zurich Policies.

2. Respondent allowed an additional deduction on the Estate's Schedule K, Debts of the Decedent, in the amount of $9 million based on the amount paid by the Estate under the settlement agreement with LT Funding.

3. Respondent increased decedent's adjusted taxable gifts by $7,734.

The Estate timely filed a Petition with the Court on July 13, 2020, and did not dispute the adjustment to adjusted taxable gifts in the Petition.

Dr. Becker resided in Maryland at the time of his death; Mr. Becker also resided in Maryland at the time of the filing of the Petition.

On June 12, 2023, respondent filed an Amendment to Answer, in which he asserted that the proceeds of the Zurich Policies are includible in the gross estate pursuant to section 2031 and, in the alternative, section 2042(2).

*Discussion*

I. *Burden of Proof*

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and taxpayers bear the burden of showing the determinations are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Conversely, the Commissioner bears the burden of proving new matters asserted in his answer. *See* Rule 142(a). The assertion of a new theory that merely clarifies or develops the original deficiency determination without being inconsistent or increasing the deficiency is not a new matter that requires the shifting of the burden of proof. *Achiro v. Commissioner*, 77 T.C. 881, 890–91 (1981). On the other hand, a new theory that is

**[\*13]** presented is treated as a new matter if it either alters the original deficiency or requires the presentation of different evidence. *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 507 (1989).

Although the Notice of Deficiency asserts that the life insurance proceeds are includible in the gross estate pursuant to section 2042(1), by timely Amended Answer respondent contends that the life insurance proceeds should be included in the gross estate pursuant to section 2031 and, in the alternative, section 2042(2) through the application of Maryland state law. These are new matters for which respondent bears the burden of proof. *See Shea v. Commissioner*, 112 T.C. 183, 197 (1999) ("[W]here a notice of deficiency fails to describe the basis on which the Commissioner relies to support a deficiency determination and that basis requires the presentation of evidence that is different than that which would be necessary to resolve the determinations that were described in the notice of deficiency, the Commissioner will bear the burden of proof regarding the new basis.").

## II.   *Maryland Law Applies to the Zurich Policies*

To determine a decedent's interest in property, the Court first looks to state law. *See Woods v. Commissioner*, 137 T.C. 159, 162 (2011) ("In a Federal tax controversy, State law controls the determination of the taxpayer's interest in the property, and the tax consequences are then determined under Federal law." (citing *United States v. Nat'l Bank of Com.*, 472 U.S. 713, 722 (1985))).

The Court applies federal choice-of-law principles in deficiency cases. *Jenkins v. Commissioner*, T.C. Memo. 2021-54, at \*33–34 (citing *Lindsay v. Beneficial Reinsurance Co.* (*In re Lindsay*), 59 F.3d 942, 948 (9th Cir. 1995)). The federal choice-of-law rules embrace the Restatement (Second) of Conflict of Laws (Am. L. Inst. 1971) (Restatement), *see Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003 (9th Cir. 1987), and Section 188 of the Restatement states the applicable rule for contracts: "The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties . . . ." Restatement § 188.

In the present case the Trust was set up in the state of Maryland and was subject to Maryland law; Dr. Becker resided in Maryland at the time of the Zurich Policy applications; each of the Zurich Policies lists Maryland as the state of issuance; and the premiums were paid to

**[\*14]** Zurich from the Trust's escrow account and thus can be considered paid in Maryland. Therefore, Maryland has the most significant relationship to the transaction and parties and therefore Maryland law governs the Zurich Policies.

Under Maryland law, although

(1) [a]n individual . . . may procure or effect an insurance contract on the individual's own life or body for the benefit of any person[,]

(2) . . . a person may not procure or cause to be procured an insurance contract on the life or body of another individual unless the benefits under the insurance contract are payable to:

(i) the individual insured;

(ii) the individual insured's personal representative; or

(iii) a person with an insurable interest in the individual insured at the time the insurance contract was made.

Md. Code Ann., Ins. § 12-201(a) (West 2024).

"For individuals related closely by blood or law, a substantial interest engendered by love and affection is an insurable interest." *Id.* subsec. (b)(2)(i). Further,

[t]he trustee of a trust has an insurable interest in the life of an individual insured under a life insurance policy owned by the trust or the trustee of a trust if, on the date on which the policy is issued:

(i) the insured is:

1. the grantor of the trust;

. . . .

3. . . . and

(ii) the life insurance proceeds are primarily for the benefit of trust beneficiaries having an insurable interest in the life of the insured.

*Id.* para. (6).

The rationale behind the insurable interest requirement is that, if a person enters into a contract for insurance on the life of another without an insurable interest in that individual, the contract is a mere

**[*15]** gambling contract and is against public policy. *See Beard v. Am. Agency Life Ins. Co.*, 550 A.2d 677, 681 (Md. 1988).

It is well settled in Maryland that "if the policy of insurance was a valid one, at its inception, . . . the assignment of this policy, under all the authorities, would be legal, whether to a person having or not having an insurable interest in the life of the insured." *See Fitzgerald v. Rawlings Implement Co.*, 79 A. 915, 917 (Md. 1911) (citing *Souder v. Home Friendly Soc'y of Balt.*, 20 A. 137, 138 (Md. 1890)).

The Trust procured insurance contracts on the life of Dr. Becker, owned by and payable to the Trust. Dr. Becker was the grantor of the Trust, and, on the date of each Zurich Policy's issuance, the proceeds were primarily for the Trust's beneficiaries—Dr. Becker's wife, children, and grandchildren—each of whom had an insurable interest in Dr. Becker's life. *See* Md. Code Ann., Ins. § 12-201(a)(2)(iii). Therefore, the policies were valid at inception and freely assignable, including to a third-party investor lacking an insurable interest, such as LT Funding. *See Fitzgerald*, 79 A. at 917.

However, this is not the end of the story, according to respondent, who urges the application of the step transaction doctrine. When the transactions are collapsed, respondent argues, the proceeds were not primarily for the benefit of the Trust beneficiaries but rather for LT Funding, per the terms of the LTF Agreement and that as a result, the Trust lacked insurable interests in the Zurich Policies on the dates of issuance.

Therefore, respondent argues that the insurance contracts violated Maryland's insurable interest statute and would give rise to a cause of action under Md. Code Ann., Ins. § 12-201(d), which provides that

> [i]f a beneficiary, assignee, or other payee under an insurance contract made in violation of this section receives from the insurer benefits that accrue on the insured's death, disablement, or injury, the insured or the insured's executor or administrator may bring an action to recover benefits from the payee that receives them.

Respondent contends that this purported cause of action under Md. Code Ann., Ins. § 12-201(d) would then trigger federal estate tax liability under section(s) 2031 and/or 2042(2).

**[\*16]** Thus, before determining whether respondent's position is correct with regard to the federal estate tax provisions, we must first consider the step transaction doctrine and whether it gives rise to a claim under Md. Code Ann., Ins. § 12-201(d) in the first place.

III.    *Step Transaction Doctrine*

The step transaction doctrine is a variation of the doctrine of substance over form, meant to ensure that transactions are taxed according to their substance and not their outward form. *See Penrod v. Commissioner*, 88 T.C. 1415, 1428–30 (1987) ("The step transaction doctrine is in effect another rule of substance over form; it treats a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result.").

Courts have articulated three threshold tests for determining when it is appropriate to apply the step transaction doctrine: the "binding commitment" test, the "end result" test, and the "interdependence" test. *True v. United States*, 190 F.3d 1165, 1174–75 (10th Cir. 1999).

Under the "binding commitment" test, separate steps may be collapsed into a single transaction only if, at the time that the first step is undertaken, the taxpayer was under a formal commitment to complete the remaining steps, often where a substantial period has passed between the steps that are subject to scrutiny. *See Commissioner v. Gordon*, 391 U.S. 83, 96 (1968).

The Court agrees with the parties that collapsing the steps under the "binding commitment" test would be inappropriate under the facts of this case (as there was no formal agreement, and the steps were completed in a matter of months, rather than years). *See Andantech LLC v. Commissioner*, T.C. Memo. 2002-97, 83 T.C.M. (CCH) 1476, 1504 ("Because the transactions in the present case do not span a long period of time or involve a binding commitment to pursue successive steps, we do not analyze them under the binding commitment test."), *aff'd in part and remanded*, 331 F.3d 972 (D.C. Cir. 2003). Consequently, we will analyze the series of transactions before us under only the "end result" and "interdependence" tests.

[*17]  A.     *"End Result" Test*

Under the "end result" test, the transactions will be collapsed if it appears that a series of formally separate steps are really prearranged parts of a single transaction intended from the outset to reach the ultimate result.  *See King Enters., Inc. v. United States*, 418 F.2d 511, 516 (Ct. Cl. 1969).  While the "binding commitment" test is an objective test, the "end result" test is a subjective test that focuses on the parties' actual intent at the time that the transaction was entered into.  *True*, 190 F.3d at 1175 ("The taxpayer's subjective intent is especially relevant under this test because it allows us to determine whether the taxpayer directed a series of transactions to an intended purpose.").

Respondent contends that "it was the intent of the trustees and Dr. Becker to transfer the Zurich Policies to LT Funding."  In support of this position, respondent posits that the Zurich Policies "do not appear to have fulfilled any major need or insured against any imminent risk" such as loss of support or payment of estate taxes.  Respondent also points to the fact that, following the execution of the LTF Agreement, the Trust would be entitled to, at most, only 25% of the death benefits payable under the Zurich Policies.  Finally, respondent posits that Dr. Becker's and the Trust's lack of sufficient assets to pay the initial premiums is further evidence of the parties' intent to transfer the death benefits to LT Funding.[4]

These contentions from respondent, taken as a whole, simply do not show that the subjective intent of the parties at the outset of the transactions was to transfer death benefits to LT Funding, a third party that was unidentified at the time that the Zurich Policies were issued.  *See, e.g.*, *Long Term Cap. Holdings v. United States*, 330 F. Supp. 2d 122, 191 (D. Conn. 2004) ("A prerequisite to application of the end result test is proof of an agreement or understanding between the *transacting parties* to bring about the ultimate result . . . ." (Emphasis added.)).  Accordingly, we cannot find that doing so was the parties' intended end

---

[4] This contention appears to be factually inaccurate: Dr. Becker reported $29,500,000 in total assets and net worth on each of the Zurich Policy applications, an amount more than sufficient to fund the initial premiums and any subsequently required premiums.  Regardless, we note that, even if Dr. Becker and the Trust did lack sufficient assets to pay initial or subsequent premiums, that fact in and of itself would mean only that the Trust would need to seek other sources to finance the premiums.

**[\*18]** result at the time of issuance and will not collapse the transactions on this basis.

  B. *"Interdependence" Test*

  The focus of the "interdependence" test is "on whether 'the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.'" *Penrod*, 88 T.C. at 1430 (quoting *Redding v. Commissioner*, 630 F.2d 1169, 1177 (7th Cir. 1980), *rev'g and remanding* 71 T.C. 597 (1979)). Thus, the "interdependence" test concentrates on the relationship between the steps, rather than on their end result, in order to determine "the result the participants hoped to achieve." *Id.*; *see also Sec. Indus. Ins. Co. v. United States*, 702 F.2d 1234, 1246–47 (5th Cir. 1983).

  Respondent contends that "[s]everal events within the transaction at issue here are interdependent on later steps, specifically the flow of money used to fund the initial premiums." Respondent looks to Dr. Wen's initial loan to Mr. Steinfelder and from Mr. Steinfelder to Dr. Becker, who in turn transferred the funds to the Trust, which then paid the premiums directly. Respondent also contends that, without an outside investor and thus the LTF Agreement, ALD (wholly owned by Mr. Steinfelder) lacked "any real opportunity for repayment"—notwithstanding the fact that the ALD Notes granted ALD first priority security interests in the Zurich Policies to repay the initial premiums plus interest.

  Even if the Trust would eventually need to seek additional funding, upon the Zurich Policies' issuance the Trust was entitled to nearly $20 million (less repayment of the ALD Notes). Further, as noted previously, because Dr. Becker held significant assets at the time of the Zurich Policies' issuance, payment of the initial and subsequent premiums does not appear contingent upon subsequent entry into the LTF Agreement. (Put another way, there is nothing to indicate that payment of the premiums would have been "fruitless" without the LTF Agreement. *See Penrod*, 88 T.C. at 1430.)

  Likewise, it cannot be said that the initial acquisition of the Zurich Policies was meaningless without the LTF Agreement, especially when taking into account the fact that the Zurich Policies were already fully funded for 30 months from the payment of the initial premiums. Rather, the picture that emerges is that, of several financing options available to Dr. Becker and the Trust to secure funding for possible

**[\*19]** future premiums, they simply chose the option that they viewed to be the most financially beneficial.

From these facts, we find that each step had "independent significance" without regard to any of the later transactions. *See id.* Accordingly, we find that applying the step transaction doctrine is inappropriate.

IV.    *Federal Estate Tax Provisions*

Section 2001 imposes an estate tax determined, in part, by the value of the taxable estate, which is defined as the gross estate less deductions. §§ 2001(b), 2051. The gross estate generally includes the value of property described in sections 2033 through 2044. *See* Treas. Reg. § 20.2031-1(a). Under section 2033, a decedent's gross estate includes the value of all property beneficially owned by the decedent at the time of death. *See* Treas. Reg. § 20.2033-1(a).

The value of an estate includes, among other things, all choses in action and any rights to income, acquired before death or because of the decedent's death, that remain unpaid at the time of death. *Estate of Curry v. Commissioner*, 74 T.C. 540, 545–46 (1980); *see also Estate of Aldrich v. Commissioner*, T.C. Memo. 1983-543. The value of property includible in the gross estate is generally its fair market value at the time of the decedent's death. *See* § 2031(a); Treas. Reg. § 20.2031-1(b). Fair market value is defined as the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all the relevant facts and neither person being under a compulsion to buy or sell. *United States v. Cartwright*, 411 U.S. 546, 551 (1973); Treas. Reg. § 20.2031-1(b).

Section 2042(2) provides that the value of the gross estate shall include proceeds of life insurance

> [t]o the extent of the amount receivable by all other beneficiaries [other than the executor] as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the *incidents of ownership*, exercisable either alone or in conjunction with any other person.

(Emphasis added.) The regulations clarify further that

20

**[\*20]** the term "incidents of ownership" is not limited to its meaning to ownership of the policy in the technical legal sense. Generally speaking, the term has reference to the right of the insured or his estate to the economic benefits of the policy. Thus, it includes the power to change the beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy . . . .

Treas. Reg. § 20.2042-1(c)(2).

As noted previously, respondent relies on the step transaction doctrine to argue, first, that the Zurich Policies violate Maryland's insurable interest doctrine and, second, that this violation gives rise to a claim that Dr. Becker or his estate could bring under Md. Code Ann., Ins. § 12-201(d). On the basis of this potential state law action, respondent contends that the face values of the policies ought to be included in the value of decedent's gross estate under sections 2031 and/or 2042(2).

However, as there has been no violation of Maryland's insurable interest doctrine, there can be no chose in action under Md. Code Ann., Ins. § 12-201(d). Consequently, it matters not whether a potential claim under that section should be treated as an "incident of ownership" under section 2042(2) or as "property" under section 2033, such that its value[5] must be included in the value of decedent's gross estate under section 2031, as no such claim exists.[6] Likewise, without an increase in the gross estate, there can be no offsetting deduction to the taxable estate under section 2053 for the amounts paid to LT Funding pursuant to the settlement agreement as a claim against the estate. *See* § 2053(a)(3).

We have considered all of the parties' arguments, contentions, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

---

[5] Because no such claim exists under the present facts, we do not reach the question of what its value would be for purposes of increasing the gross estate.

[6] Respondent has not contended that decedent or his estate has retained any incidents of ownership over the Zurich Policies beyond the purported Maryland state law claim; regardless, as neither decedent nor his estate held any right to the benefits of the policies, we find that neither decedent nor his estate possessed any incidents of ownership over the policies. *See* Treas. Reg. § 20.2042-1(c)(2).

**[\*21]**  To reflect the foregoing,

*Decision will be entered pursuant to Rule 155.*